**Andrew TAYLOR, Plaintiff-Appellant,**

**v.**

**MORAM AGENCIES, Far Eastern Steamship Company, and Does I through XX, inclusive, Defendants-Appellees.**

No. 82–4646.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 12, 1984.

Decided June 4, 1984.

John J. Hughes, Law Offices of Mansfield Davis, San Francisco, Cal., for plaintiff-appellant.

John A. Flynn, Graham & James, San Francisco, Cal., for defendants-appellees.

Before ANDERSON, SKOPIL, and FERGUSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Andrew Taylor, a longshoreman, was injured in a fall while assisting to discharge a cargo of mung beans from a Russian freighter on June 20, 1976. He appeals a district court judgment in favor of defendant Far Eastern Steamship Company (FESCO) entered after the conclusion of a bench trial. We affirm.

Fed.R.Civ.P. 52(a) establishes the rule that findings of fact will not be set aside unless they are "clearly erroneous," emphasizing that due regard should be given to the trial court's opportunity to judge the credibility of the witnesses. A finding of fact is "clearly erroneous" within the meaning of Rule 52(a) and should be reversed where, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *United States of America v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). To the extent that the findings of the trial court represent an application of the law to the facts found, this court is not restricted by Rule 52(a) and may make its own application of the law as it understands it. *Kwikset Locks, Inc. v. Hillgren*, 210 F.2d 483 (9th Cir.1954).

*Responsibility in Turning Over the Vessel*

Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, as amended in 1972, provides in relevant part as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . .

33 U.S.C. § 905(b). The provisions of the Act, in regard to the scope of a vessel owner's duty and the standard of care to be applied in suits by longshoremen, was recently addressed by the United States Supreme Court in *Scindia Steam Navigation v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Citing an earlier decision in *Marine Terminals v. Burnside Shipping Co.*, 394 U.S. 404, 405, 89 S.Ct. 1144, 1145, 22 L.Ed.2d 371 (1969), the Court held that "the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care 'under the circumstances,'" and that such duty extends

> at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and *to warning the stevedore of any hazards on the ship* or with respect to

> its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and *that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.*

*Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622 (emphasis added). The Court went on to hold that "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." *Id.* at 170, 101 S.Ct. at 1623. The Supreme Court also noted that

> absent contract provision, positive law, or custom to the contrary, the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.

*Id.* at 172, 101 S.Ct. at 1624.

■ The district court's finding of shipowner compliance with its responsibility to provide a vessel and equipment in reasonably safe condition is based on sound evidence. The scope of the shipowner's duty as set forth in *Scindia* focuses on the character of the ship and its equipment—not on the nature of the cargo. The torn sacks of beans, lying in the hold, posed no threat; it was only when the cargo discharge began and the wind blew the leaking beans onto the deck and winch platform that a hazardous condition developed. Thus, it was not the torn sacks but the stevedore's subsequent failure to take appropriate precautions in the course of the operation that created the danger. Under the provisions of *Scindia*, a shipowner who has turned over a safe vessel and equipment has the right to rely on the stevedore to avoid exposing the longshoremen to hazards which develop within the confines of the cargo operation.

■ The cases providing a basis for placing a duty to warn of hidden dangers on the shipowner are not dispositive of this

matter. In particular, *Turner v. Japan Lines, Ltd.*, 651 F.2d 1300 (9th Cir.1981) and *Subingsubing v. Reardon Smith Line, Ltd.*, 682 F.2d 779 (9th Cir.1982), while imposing a duty to warn on the shipowner, would require warning only in regard to hidden (*Turner*) or nonobvious (*Subingsubing*) dangers. Here, the damaged condition of the sacks was obvious to the stevedore when the hatch was opened. The difficulty with this type of cargo was well known to the experienced stevedore personnel. In fact, one representative of the stevedore company testified that leakage was a problem with bad sacks of beans and that "if there is beans, there's going to be slips." R.T. 456. It was not clearly erroneous for the trial court to have found no hidden danger of which the shipowner had a duty to warn in the face of the evidence demonstrating that the stevedores were well aware of this particular problem and of the difficulties which were expected in cargo operations of this type.

*Shipowner's Active Involvement and Control*

■ A shipowner may be held liable under *Scindia* if the shipowner actively involves itself in the cargo operation or fails to exercise due care to avoid exposing longshoremen to hazards in an area or from equipment under the vessel's active control. The Court in *Scindia* held that

the vessel's duty to the longshoreman [does not] require[ ] the shipowner to inspect or supervise the stevedoring operation. *Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore.*

451 U.S. at 168, 101 S.Ct. at 1622–23 (emphasis added).

■ The trial court's finding that the shipowner had not assumed exclusive or concurrent control of the platform where the accident occurred is not clearly erroneous. There is ample evidence that the handling of the cargo and ship's gear in connection with the discharge of the sacks of mung beans was accomplished entirely by the longshoremen under the direction of stevedore supervisory personnel. The mates from the ship, although observing the operation, made no attempt to interfere. The winch drum oiling was undertaken by the ship's crew at the request of stevedore personnel, but this episode cannot serve as the basis for establishing the requisite degree of shipowner involvement and control. Additionally, although the evidence is not clear as to who requested what sweeping on which occasions and when, if more than once, any sweeping occurred, it does appear that any sweeping that was done was undertaken at the specific request of the stevedore personnel and that the ship's crew did not attempt to interrupt the cargo discharge operation while the sweeping was accomplished.

Recent circuit court decisions accord with the *Scindia* requirement of active control by the vessel over the equipment or areas in question. *See Sarauw v. Oceanic Navigation Corporation*, 655 F.2d 526 (3d Cir. 1981) (gangway to vessel, supplied by stevedore, held not an appurtenance within the confines of cargo operation) and *Davis v. Partenreederei M.S. Normannia*, 657 F.2d 1048 (9th Cir.1981) (longshoreman injured by cargo discharged in close proximity to gangway held to have action for negligence based on shipowner's concurrent control of the gangway). The Third Circuit specifically held that the ship had maintained control over the manner in which the gangway was to be secured, an "essential appurtenance of the ship," rather than equipment strictly within the confines of the cargo operation. *Sarauw*, 655 F.2d at 529. This active control over the area or equipment utilized in the cargo operation is distinct from the casual use of the deck by the ship's crew for passage or activities undertaken by the crew at the specific request of stevedore personnel.

*Shipowner Intervention*

■ The *Scindia* Court made it clear that the primary responsibility for maintaining a safe condition during cargo operations rests on the stevedore. An exception to this rule is recognized where a shipown-

er (1) has actual or constructive knowledge of a dangerous condition, (2) knows that the longshoremen are continuing to work despite the existence of an unreasonable risk of harm to them, and (3) could not reasonably expect that the stevedore would remedy the situation. 451 U.S. at 175–176, 101 S.Ct. at 1626–1627.

■ The factual findings of the district court in this regard are not clearly erroneous. Inasmuch as *Scindia* does not impose a duty to inspect, there is no conclusive evidence that the shipowner knew or had reason to know of the presence of beans on the winch platform. The testimony concerning the requested sweeping was contradictory. Even if the shipowner had knowledge of the beans' invasion of the winch platform, it would not necessarily follow, as the district court pointed out, that the beans created a sufficiently high risk of harm to require intervention in the cargo operation by the shipowner. Testimony revealed that spillage of beans during this type of operation is normal; the stevedore superintendent himself walked through the beans and did not consider them to be hazardous. In light of custom, regulation and case law which address the matter, it was reasonable for the shipowner to expect the stevedore to do what was necessary to maintain a safe place for the longshoremen to work.

■ The district court did not err in finding that the shipowner had not assumed an obligation to intervene in the cargo discharge operation by virtue of either the stevedoring contract or the mate's agreement to take care of the spillage problem. In upholding the district court, we have in mind the rule that a "shipowner's mere knowledge of a dangerous condition will not serve, without more, as a basis for liability." *Lieggi v. Maritime Co. of Philippines*, 667 F.2d 324, 327. (2d Cir. 1981); *cf. Bueno v. United States*, 687 F.2d 318, 320 (9th Cir.1982) (during regular safety inspections, shipowner should have noticed and corrected a danger created by third-party sandblaster). In *Lieggi*, the Second Circuit premised liability on the fact that a ship's mate had promised to clean up a greasy wire on the deck and then failed to do so. Liability was determined to extend to the shipowner on the ground that the ship had assumed an obligation to clean up the wire and had not fulfilled that responsibility. We do not believe that liability extends to the shipowner in this case.

We agree that neither the stevedoring contract nor the mate's promise furnishes the basis for shipowner liability. The financial arrangements, standing alone, do not support the conclusion that the longshoremen should continue to work in the face of an obvious danger, nor should those arrangements provide a basis for asserting vessel responsibility for an unsafe condition on its winch platform that was never unequivocally called to its attention and which it never attempted to remedy. Liability might be considered to extend to the shipowner on the basis of the mate's promise; however, we cannot extend that liability on the facts of this matter.

■ Had the ship's mate failed to sweep the deck, this case would be analogous to the mate's failure to clean up the greasy wire in *Lieggi*. Here, the deck was swept within 30 minutes of the mate's promise to do so. We find that by sweeping the deck, without it being clear that he was also asked to clean the winch platform, the mate fulfilled any responsibility the vessel assumed by reason of the promise. In light of the stevedore's obligation to properly discharge the cargo, we do not believe that the vessel owed a continuing duty to clean up the beans. The stevedore had a duty to discharge the cargo properly to avoid waste and loss to the owner and to avoid hazardous conditions involving the longshoremen's safety. By assuming the responsibility for cleaning up the original spillage on the deck, the vessel will not be obligated to a continuous duty to clean up additional spillage resulting from the stevedore's failure to properly discharge the cargo.

### Conclusion

Our review of the evidence has established that the district court's findings of fact were not clearly erroneous. The dis-

trict court had ample opportunity to weigh the evidence presented and to judge the credibility of the witnesses. We will not attempt to do so here. For the foregoing reasons, we

AFFIRM.

FERGUSON, Circuit Judge, dissenting:

Andrew Taylor, the plaintiff, was injured while working as a longshoreman unloading a vessel owned by the defendant, Far Eastern Steamship Co. (FESCO). Taylor, who operated the winch, was injured when he slipped on loose mung beans that were on the winch platform. The question before the court is: Was FESCO negligent in failing to remove the beans from the winch platform.

The district court entered judgment for FESCO after a bench trial. In reviewing its decision, we freely review questions of law, while findings of fact are overturned only if clearly erroneous. *Miller v. United States*, 587 F.2d 991, 994 (9th Cir.1978). "A determination of negligence is generally recognized as a mixed question of law and fact." *Id.* The appropriate standard of conduct required of the defendant is a question of law. *Id.*

In reviewing the facts as found by the district court, I conclude that the district court both applied an incorrect standard of care, and erred in applying the facts to the heightened standard of care it adopted. The facts show that FESCO was negligent and that its negligence caused plaintiff's injury. I would remand for further proceedings consistent with this opinion.

FACTS

The facts as found by the district court are as follows: When the ship M/V Nikolay Karamzin arrived in the San Francisco Bay, the shipowner, FESCO, engaged the services of Crescent Wharf and Warehouse Company (stevedore) to discharge the cargo from the vessel. Following a preliminary inspection of the work area by the stevedore's walking boss on June 19, 1976, the longshoremen boarded the vessel and prepared to unload the ship's cargo. The preliminary inspection was undertaken by the stevedore to assure that no unsafe condition existed in the longshoremen's work area.

After general cargo was unloaded from the upper portions of the ship's hatch number five, the lower hold was opened. Stored in the lower hold were sacks of mung beans from Bangkok. These beans are the size of BBs and are hard, round and green. On opening the lower hold, the longshoremen noticed that some of the sacks were torn and leaking beans. The stevedore's daily cargo report for June 19 stated exceptions to cargo conditions as follows: "Five Lower Hold, Beans on First Tier, Bags Dirty, Stained and Torn. Contents Leaking. X Ship." "X Ship" means cargo observed while still on the ship. FESCO's cargo officer, Malyavin, signed the report, acknowledging its accuracy.

The sacks of beans leaked as they were placed on pallets, hoisted out of the hold, and unloaded. Beans spilled onto the main deck and were tracked around the ship. Plaintiff and his partner Malbreau testified that beans were blown up onto the steel deck of the winch platform. The stevedore's gang boss Ward, FESCO's chief mate Klementyev, and cargo mate Malyavin testified that while they saw beans spilled on the main deck throughout the discharge operation, they saw none on the winch platform.

At around 1:00 p.m. on the afternoon of June 19, while Taylor was working as a hatch tender on the main deck, he complained to gang boss Ward about the beans on the main deck, and asked that they be swept. Ward notified a ship's mate about the beans on the deck at about 1:30 p.m. Because sweeping was considered "extra labor" for which the stevedores could charge the vessel, it was customary for the stevedore to notify the vessel officer if such work needed to be done, either to secure permission to do the work or to get the vessel's crew to do it. On being notified of spillage on the main deck, the mate said he would take care of it, and within thirty minutes he sent a crew member who swept the main deck area.

Before the crew member came, Taylor, who had rotated positions to work as a winch driver, told Ward that there were also beans on the winch platform that needed to be swept. When the crew member came to sweep the main deck, plaintiff yelled from the winch platform, "come here," beckoned to the sailor, and gestured to him with a sweeping motion. The sailor did not respond and did not sweep the winch platform.

About an hour later, Ward complained a second time to the ship's mate at hatch number five about the bean spillage, and asked that the main deck be swept. Ward's testimony is contradictory on whether he also asked the mate to have the winch platform swept;[1] in any event, the platform was not swept.

Ward pointed out the bean spillage to the mate a third time at about 4:00 p.m. while both Ward and the mate were standing next to hatch number five, and Ward asked the mate to station a man at the hatch to sweep the constant flow of beans. The mate responded that he was shorthanded, but that the longshoremen should continue to work because he would have the spillage problem taken care of. Beans continued to accumulate on the main deck and the winch platform throughout the afternoon, but no more sweeping was done that day or the next by either crew members or longshoremen.

On the evening of June 19, Ward mentioned the bean spillage to the stevedore's walking boss Greggio, who said he would contact the mate. Greggio did not recall whether Ward mentioned spillage on the winch platform. Vessel officers on watch inspected the main deck and winch platform during the days the cargo was being unloaded. While they saw beans on the deck, they did not consider the deck or platform to be dangerous.

At 8:00 a.m. on the morning of June 20, plaintiff and the longshoremen resumed the cargo discharge from hatch number five. According to the plaintiff, when he went to the winch platform, there were "some beans" there. His accident occurred at 9:30 a.m. when Taylor and gang boss Ward went to take slack out of the midship guy, located on the winch platform. As plaintiff pulled on the guy wire, his feet slipped out from under him and he fell on his back and head. He allegedly lost his footing because of the beans underfoot.

Stevedore personnel testified that it was their practice to report dangerous conditions they observed, such as slippery decks, to the gang boss, who in turn would report them to the ship's mate, and that it was then the ship's officers' responsibility to remedy those conditions. Chief mate Klementyev and cargo mate Malyavin agreed that elimination of dangerous conditions on deck, once reported, was their responsibility. Indeed, the director of the shipping company had issued a "recommendation" which provided that "[i]f the stevedore reports to the ship's officer that ... some unsafe condition exists in the work area, the ship's officer should immediately look into the matter and either correct it or cause it to be corrected." With respect to sweeping, FESCO instructed the stevedore company not to have longshoremen sweep decks unless specifically instructed to do so, because FESCO preferred to avoid the extra expense such work would entail.

## DISCUSSION

A longshoreman may bring an action against a vessel if he is injured while working on the ship and he can show that the vessel's negligence caused his injury. 33

---

1. The district court added this footnote:

   *Compare* R.T. 326: "Q: Did you mention the winch platform? A: No." *with* R.T. 327: "Q: Did you mention anything else to the mate the second time you talked to him other than saying, 'We've got beans on the main deck'? A: Yes, I mentioned that the winch platform had not been swept also. Q: Oh? I thought you just said you didn't mention any thing about the winch platform and beans on the winch platform to him on the second time. A: Well, I did. I mentioned that. Q: You did? A: Yes. Q: You are certain of that? A: Yeah. Q: And what did the man say? A: He would take care of the matter. See also the same witness' testimony at R.T. 328–35

U.S.C. § 905(b). This represents a change in the law, for prior to the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, a vessel was strictly liable for injuries even in the absence of fault or negligence. *Id.; Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 164–65, 101 S.Ct. 1614, 1620–21, 68 L.Ed.2d 1 (1981). In *Scindia,* the Supreme Court articulated the standard of care required of a vessel during unloading operations. Once a problem is brought to the attention of the vessel, it is necessary to determine whether custom or contract places a duty on the vessel or on the stevedore to correct the problem. 451 U.S. at 176 & n. 23, 101 S.Ct. at 1626 & n. 23.

The relevant inquiry in this case is whether the ship, by contract, custom or law, *Scindia,* 451 U.S. at 172, 176 & n. 23, 101 S.Ct. at 1624, 1626 & n. 23, was obligated to eliminate the hazard created by the loose beans. The facts as stated by the district court lead to the unavoidable conclusion that the ship expressly agreed to "have the spillage problem taken care of" because "FESCO preferred to avoid the extra expense such work would entail." Given the ship's express assumption of duty to eliminate the unsafe condition, the only remaining inquiry is whether the ship adequately performed that duty. *See Lieggi v. Maritime Co. of Philippines,* 667 F.2d 324, 328–29 (2d Cir.1981). Contrary to the conclusion of the majority opinion, the stevedore fulfilled its duty to maintain a safe work environment when it reported the dangerous condition on the deck, i.e., the leaking beans, to the ship's mate pursuant to FESCO's recommended procedure and its usual practice.

The majority opinion states that "the district court did not err in finding that the shipowner did not assume an obligation to intervene by virtue of the stevedoring contract and the mate's agreement to take care of the beans," and that financial arrangements cannot provide a basis for the ship's liability. Yet what evidence could possibly be stronger to show an assumption of the duty to eliminate an unsafe condition than the finding that the stevedore's practice was to report unsafe conditions to the ship's mate, and that the ship's crew agreed that the "elimination of dangerous conditions on the deck, once reported, was their responsibility." *See Lieggi, supra.*

The district court rejected plaintiff's argument that the ship actively involved itself in the cargo operations, stating that the ship's officers "acted only as occasional observers." This conclusion is clearly erroneous in light of the district court's findings of fact that the ship's mate repeatedly told the longshoremen's gang boss that "he would have the spillage problem taken care of," that "the longshoremen should continue to work," and that "FESCO instructed the stevedore company not to have longshoremen sweep the deck unless specifically instructed to do so, because FESCO preferred to avoid the extra expense such work would entail." FESCO's assumption of control was even greater than the shipowner's concurrent control in *Davis v. Partenreederei M.S. Normannia,* 657 F.2d 1048, 1052 (9th Cir.1981), upon which partial liability for negligence was affirmed.

The majority opinion and the district court draw a distinction between the duty to sweep the deck and the duty to sweep the winch platform. However, the longshoremen would not be paid to sweep, whether it was the winch platform or the deck. Whether the ship agreed to sweep a specific area is not the question. The ship knew that the problem was the spillage of loose beans, as shown by the cargo mate's signature on the stevedore's daily cargo report. It agreed to correct the problem on at least three occasions and consequently assumed responsibility to sweep wherever necessary. FESCO could not have reasonably expected the stevedore to sweep the beans from the deck or the winch platform as "[i]ndeed, predictably, the shipowner's undertaking to correct the condition lulled the stevedore into inaction." *Lieggi,* 667 F.2d at 329. In *Lieggi,* the court held that, as a matter of law, the shipowner could not escape liability under similar circumstances.

The district court further supported its decision by stating that the presence of beans did not create a sufficiently serious risk of harm to require intervention. It was not proper for the court to conclude that "the shipowner could reasonably have expected that the stevedore would comply with its legal obligation to do what was necessary to maintain a safe place to work" after it found that the stevedore had brought the problem to the crew's attention and the ship's crew had expressly, whether reasonably or not, agreed to "take care of" the spillage. Shielding the shipowner from the results of its decision to save money by assuming the obligation to either "correct [the problem] or cause it to be corrected" is not an appropriate function of the judiciary. The "reasonableness" of the shipowner's failure to act is not relevant when there has been an express assumption of duty. See Scindia, 451 U.S. at 178, 101 S.Ct. at 1627.

The district court also stated that even if a dangerous condition existed, the shipowner was relieved of liability because the longshoremen continued to work. In Scindia, the Court rejected the notion that a shipowner may escape liability on the ground that the stevedore should have refused to continue working in face of an obvious hazard. 451 U.S. at 176 n. 22, 101 S.Ct. at 1626 n. 22. In this case the crew told the longshoremen to continue working. Unloading operations would be disrupted and longshoremen would be placed in an impossible position if the workers were found to forfeit their right to rely on a promise of the shipowner by complying with its instructions to continue working. Moreover, a shipowner "is not absolved of liability just because a stevedore is negligent." Subingsubing v. Reardon Smith Line, Ltd., 682 F.2d 779, 781 (9th Cir.1982).

The district court used an incorrect legal standard in analyzing the facts after trial. The proper inquiry was whether FESCO assumed the duty to eliminate the slipping hazard created by the beans by virtue of its agreement with the stevedore. I would conclude that the finding that FESCO was not negligent was clearly erroneous in view of the incorrect standard of conduct applied

by the district court. See Miller v. United States, 587 F.2d at 996.

Further, FESCO should not have been absolved of responsibility for the accident under the standard actually applied by the district court. The district court held FESCO to a standard of care applicable to situation in which the shipowner would be required to intervene by law. Three conditions must be met in order to expose a ship to liability for negligence in the absence of an assumption of duty. They are: the shipowner (1) has actual or constructive knowledge of a dangerous condition, (2) knows that the longshoremen are continuing to work despite the existence of an unreasonable risk of harm to them, and (3) could not reasonably expect that the stevedore itself would remedy the condition. Scindia, 451 U.S. at 175–76, 101 S.Ct. at 1626–27. The district court's conclusion that the evidence was insufficient to sustain plaintiff's burden was clearly erroneous even under this standard.

The first requirement is that FESCO had actual or constructive knowledge of the danger. Although there is a dispute about whether or how the gang boss told the ship's mate about the loose beans on the winch platform, see n. 1, without resolving this dispute, it is clear that it was FESCO's policy to save money by sweeping the deck of the ship when required or when the need was brought to its attention. The stevedore's gang boss told FESCO's officers about the spillage and the attendant slipping hazard. Upon learning of the problem, the ship's officers said that they would take care of it. Thus they obligated themselves to remove the hazard created by the beans from the longshoremen's work area. See Lieggi v. Maritime Co. of Philippines, supra. If the ship's officers were told that there were loose beans on the winch platform, FESCO had knowledge of the problem there and was negligent in failing to eliminate it. Even if the ship's officers were not directly told that loose beans were on the winch platform, the district court found that "[v]essel officers on watch inspected the main deck and the winch platform during the days the cargo

was being unloaded." The ship is chargeable with knowledge of the presence of the beans on the platform because it knew about the slipping hazard created by the beans and in fact inspected the platform where the accident occurred. *See Bueno v. United States*, 687 F.2d 318, 320 (9th Cir. 1983).

The second two requirements stated by the district court were also met. The ship agreed to clean up the spilled beans, declined to pay longshoremen to sweep, and directed the stevedore to keep working. Based on these facts, the district court's conclusion that the evidence was insufficient to show that FESCO knew of the hazard, knew that the longshoremen would continue to work and could not reasonably expect the stevedore to remedy the situation was clearly erroneous.

I would reverse and remand with instructions to conclude that FESCO assumed the responsibility to remedy the problems associated with the spilled beans.

